IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ANNETTE BENNETT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 2:12-00168-CG-N |
| | ) |
| CAROLYN W. COLVIN,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

ORDER

Plaintiff Annette Bennett ("Bennett") filed this action seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") that she was not entitled to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401-33.  Pursuant to the consent of the parties (doc. 21), this action has been referred to the undersigned Magistrate Judge to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R.Civ.P. 73.  *See* Doc. 22.  The parties' joint motion to waive oral arguments (doc. 22) was granted on November 6, 2012 (doc. 25)  Upon consideration of the administrative record

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit. No further action need be taken to continue this suit in view of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

(doc. 14) and the parties' respective briefs (docs. 16 and 19), the undersigned concludes

that the decision of the Commissioner is due to be **AFFIRMED**.

     I.      Procedural History.

     Plaintiff Annette Bennett filed an application for DIB benefits on July 1, 2008,

(Tr. 101-104), claiming an onset of disability beginning March 15, 2007, due to diabetes,

high blood pressure, left hand problems, and hearing loss (Tr. 140).  The application was

denied on September 12, 2008 (Tr. 49-54).  Bennett timely requested a hearing on

November 14, 2008 (Tr. 57-58) before an Administrative Law Judge ("ALJ").  A hearing

was held on July 1, 2010 (Tr. 21-47), and the ALJ issued an unfavorable decision on

September 15, 2010 (Tr. 7-20).  Bennett requested a review by the Appeals Council on

October 11, 2010 (Tr. 93-100), which was denied on January 23, 2012 (Tr. 1-6), thereby

making the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R.

§ 404.981, 422.210(a) (2012)[2].  Bennett has exhausted all her administrative remedies

and this case is ripe for judicial review under § 205(g) of the Act, 42 U.S.C. § 405(g).

     II.     Issues on Appeal.

     1.      Whether the ALJ erred in rejecting the opinion of Bennett's retained

examining consultant, Donald W. Blanton, Ph.D.?

     2.      Whether the ALJ erred in failing to find that Bennett meets Listing 12.05C?

---

[2] All references to the Code of Federal Regulations (C.F.R.) are to the 2012 edition.  Also, all references are to Part 404 of the regulations, which addresses claims under Title II of the Act. All of the cited regulations have parallel citations in Part 416 of the regulations, which addresses claims under Title XVI of the Act.

3.      Whether the Appeals Council erred in failing to remand the ALJ 's decision to consider the September 14, 2011 opinion regarding pain rendered by Bennett's treating physician following the ALJ's decision?

III.    Standard of Review.

A.      Scope of Judicial Review.

In reviewing claims brought under the Social Security Act, this Court's role is a limited one.  Specifically, the Court's review is limited to determining: 1) whether the decision is supported by substantial evidence, and 2) whether the correct legal standards were applied. *See*, 42 U.S.C. § 405(g); Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004) (per curiam); Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2001); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  Thus, a court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996); Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). Rather, the Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Chater, 84 F.3d at 1400;  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991).  Substantial evidence is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. *See* Richardson v. Perales, 402 U.S. 389, 401 (1971); Crawford, 363 F.3d at 1158; Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence "is more than a scintilla, but less than a preponderance," Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) *See also*, Martin, 894 F.2d at 1529

3

("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence."). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Lynch v. Astrue, 358 Fed.Appx. 83, 86 (11th Cir. 2009); Martino v. Barnhart, 2002 WL 32881075, * 1 (11th Cir. 2002); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991).

The ALJ is responsible for determining a claimant's RFC, an ingrained principle of Social Security law.  *See* 20 C.F.R. § 416.946(c) ("If your case is at the administrative law judge hearing level under § 416.1429 or at the Appeals Council review level under § 416.1467, the administrative law judge or the administrative appeals judge at the Appeals Council (when the Appeals Council makes a decision) is responsible for assessing your residual functional capacity.")  "Residual functional capacity, or RFC, is a medical assessment of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related symptoms." Peeler v. Astrue, 400 Fed.Appx. 492, 493 n. 2 (11th Cir. Oct.15, 2010), *citing* 20 C.F.R. § 416.945(a).  *See also*, Hanna v. Astrue, 395 Fed.Appx. 634, 635 (11th Cir. Sept.9, 2010) ("A claimant's RFC is 'that which [the claimant] is still able to do despite the limitations caused by his ... impairments.'")(*quoting* Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir.2004).  "In making an RFC determination, the ALJ must consider all the record

4

evidence, including evidence of non-severe impairments." Hanna, 395 Fed.Appx. at 635 (citation omitted); *see also* 20 C.F.R. § 416.945(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record."); 20 C.F.R. § 416.945(a)(3) ("We will assess your residual functional capacity based on all of the relevant medical and other evidence.").  The regulations provide, moreover, that while a claimant is "responsible for providing the evidence [the ALJ] ... use[s] to make a[n][RFC] finding[,]" the ALJ is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary," and helping the claimant get medical reports from her own medical sources. 20 C.F.R. § 416.945(a)(3). In assessing RFC, the ALJ must consider any statements about what a claimant can still do "that have been provided by medical sources," as well as "descriptions and observations" of a claimant's limitations from her impairments, "including limitations that result from [ ] symptoms, such as pain[.]" *Id.*

In determining a claimant's RFC, the ALJ considers a claimant's "ability to meet the physical, mental, sensory, or other requirements of work, as described in paragraphs (b), (c), and (d) of this section." 20 C.F.R. § 416.945(a)(4).

> (b) Physical abilities. When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

5

(c) Mental abilities. When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce your ability to do past work and other work.

(d) Other abilities affected by impairment(s). Some medically determinable impairment(s), such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions, may cause limitations and restrictions which affect other work-related abilities. If you have this type of impairment(s), we consider any resulting limitations and restrictions which may reduce your ability to do past work and other work in deciding your residual functional capacity.

20 C.F.R. § 416.945(b), (c) & (d).  *See also* Kennedy v. Astrue, 2012 WL 2873683, * 7-8 (S.D. Ala. July 13, 2012).

B.    Statutory and Regulatory Framework.

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are

6

identical; therefore, claims for DIB and SSI are treated identically for the purpose of
determining whether a claimant is disabled.  Patterson v. Bowen, 799 F.2d 1455, 1456 n.
1 (11th Cir. 1986). Applicants under DIB and SSI must prove "disability" within the
meaning of the Social Security Act, which defines disability in virtually identical
language for both programs. See 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20
C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the
person is unable "to engage in any substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous period of not less than 12
months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental
impairment" is one that "results from anatomical, physiological, or psychological
abnormalities which are demonstrable by medically acceptable clinical and laboratory
diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation
process to determine whether a claimant is entitled to benefits. See 20 C.F.R. §§
404.1520, 416.920 (2010).  The Eleventh Circuit has described the evaluation to include
the following sequence of determinations:

(1) Is the person presently unemployed?

(2) Is the person's impairment(s) severe?

(3) Does the person's impairment(s) meet or equal one of the specific
impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[3]

---

[3] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). *See also* Bell v. Astrue, 2012 WL 2031976, *2 (N.D. Ala. May 31, 2012); Huntley v. Astrue, 2012 WL 135591, *1 (M.D. Ala. Jan. 17, 2012).

The burden of proof rests on a claimant through Step 4. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a *prima facie* case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id.*

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). *Id.* at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. *Id.* It also can contain both exertional and nonexertional limitations. *Id.* at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id.* at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app. 2 ("grids"), or hear testimony from a vocational expert (VE). Id. at 1239–40.

C.    Listing 12.05(C).

Unlike the other mental disorders listings in the regulations, Listing 12.05

contains an introductory paragraph, or a "diagnostic description," with criteria the

claimant must meet in addition to meeting one of the "four severity prongs" for mental

retardation.  *See* Randall v. Astrue, 570 F.3d 651, 659-60 (5th Cir. 2009); Wall v. Astrue,

561 F.3d 1048, 1062 (10th Cir. 2009); Novy v. Astrue, 497 F.3d 708, 709 (7th Cir. 2007);

Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006); Foster v. Halter, 279 F.3d 348,

354 (6th Cir. 2001).  The Eleventh Circuit has recognized the distinction with respect to

Listing 12.05 as follows:

> Listing 12.05, the listing category for mental retardation, begins with an
> introductory paragraph, which states that "[m]ental retardation refers to
> significantly subaverage general intellectual functioning with deficits in adaptive
> functioning initially manifested during the developmental period; i.e., the evidence
> demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part
> 404, Subpart P, Appendix 1, § 12.05. The listing further provides that the
> "required level of severity for this disorder is met when the requirements in A, B,
> C, or D are satisfied." *Id.* Subsection C requires a claimant demonstrate "a valid
> verbal, performance, or full scale IQ of 60 through 70 and a physical or other
> mental impairment imposing an additional and significant work-related limitation
> of function." *Id.* at § 12.05(C). Section 12.00A states in pertinent part that
> "[l]isting 12.05 contains an introductory paragraph with the diagnostic description
> for mental retardation. It also contains four sets of criteria (paragraphs A through
> D). If your impairment satisfies the diagnostic description in the introductory
> paragraph and any one of the four sets of criteria, we will find that your
> impairment meets the listing." *Id.* at § 12.00A (emphasis added).

> We have determined that, to be considered for disability benefits under
> Listing 12.05, a claimant must at least (1) have significantly subaverage general
> intellectual functioning; (2) have deficits in adaptive functioning; and (3) have
> manifested deficits in adaptive behavior before age 22. Crayton v. Callahan, 120
> F.3d 1217, 1219 (11th Cir. 1997). In addition, for presumptive disability under
> 12.05C, the claimant must have (1) a valid IQ score of 60 through 70 inclusive,
> and (2) an additional mental or physical impairment significantly affecting the
> claimant's ability to work. *Id.* at 1219-1220.

Pettus v. Astrue, 226 Fed. Appx. 946, 948 (11th Cir. Apr. 5, 2007).  In Humphries v. Barnhart,  the Eleventh Circuit held:

> Here, substantial evidence supports the ALJ's finding that Humphries' impairments do not meet or equal the Listing 12.05(C) because, despite her IQ of 65, she does not have deficits in her adaptive functioning. Humphries worked in a school cafeteria for 21 years, and served as the manager for about 15 years. As manager, Humphries gave the five employees under her supervision daily lists of tasks, ensured breakfast and lunch were prepared on time, and ordered groceries for the cafeteria.

183 Fed. Appx. 887, 890 (11th Cir. June 8, 2006).  A rebuttable presumption exists that any claimant who has demonstrated a valid IQ score under 70 has also "manifested deficits in adaptive functioning before the age of 22" and therefore satisfies the criteria for Listing 12.05(C); the presumption must then be rebutted by the Commissioner with evidence that, despite a valid IQ score of 60 through 70, the claimant does not have deficits in adaptive functioning.  Grant v. Astrue, 255 Fed. Appx. 374, 375 (11th Cir. Nov. 13, 2007).  *See also* Frank v. Astrue, 2011 WL 6111692, *2-4  (S.D. Ala. Dec. 8, 2011)("[T]he law in this Circuit is clear that where, as here, a claimant has presented a valid IQ score of 60 to 70, she is entitled to the presumption that she manifested deficits in adaptive functioning before the age of 22 [and] [t]o establish a disability under section 12.05(C), a claimant must present evidence of a valid verbal, performance, or full-scale I.Q. score of between 60 and 70 inclusive, and of a physical or other mental impairment imposing additional and significant work-related limitation of function.").

The second prong of Listing 12.05(C) requires evidence of "a physical or other mental impairment imposing an additional and significant work-related limitation of

function."  Etheridge v. Astrue, 2009 WL 3233899, *10 (S.D. Ala. Sept. 29, 2009).  This

once meant that the "work-related limitation of function" must be "significant," but it

need not be a "severe impairment" as defined at Step 2.  However, as explained in Black

v. Astrue, 678 F.Supp.2d 1250, 1262 (N.D. Ala. 2010):

> Under an earlier version of this Listing, our circuit interpreted this as
> something that is "significant" but less than a "severe impairment" as
> defined at Step 2. Edwards by Edwards v. Heckler, 755 F.2d 1513, 1515
> (11th Cir.1985) (emphasis added). But (citation omitted), this was modified
> in 2000 and the introductory paragraph of Listing 12.00 now equates this
> criterion with a "severe" impairment as intended at step 2 and governed by
> 20 C.F.R. §§ 404.1520(c) and 416.920(c).

678 F.Supp.2d at 1262.  Consequently, the claimant must do more than merely cite to an

ALJ's finding that a particular condition is a "severe impairment" for purposes of Step 2

of the sequential evaluation.

Listing 12.05(C) requires a claimant to demonstrate "a valid verbal, performance,

or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an

additional and significant work-related limitation of function."  Pettus, 226 Fed. Appx. at

948.  In order to determine the severity of a mental impairment within the context of

12.05(C), the Commissioner is required, at all levels of the administrative process, to

apply the "special technique" of review set forth in 20 C.F.R. §§ 404.1520a and

416.920a.  Taylor v. Astrue, 2009 WL 5184402, *3 (M.D. Ala. Dec. 23, 2009), citing

Nicola v. Astrue, 480 F.3d 885, 887 (8th Cir. 2007), and Binion v. Astrue, 2008 WL

4493238 (M.D. Ala. Oct. 3, 2008).  This "special technique" is described as follows:

> Under the "special technique," after determining whether or not the claimant
> suffers from some mental impairment(s), the Commissioner then rates the degree
> of functional limitation resulting from the impairment(s). The Commissioner rates

the degree of limitation imposed in four distinct "functional areas" including: "activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." § 404.1520a(c)(3). The Commissioner uses a five-point scale (none, mild, moderate, marked, and extreme) in rating the first three functional areas, and a four-point scale (none, one, two, three, and four or more) in rating episodes of decompensation. If the degree of limitation found in all of the first three areas is "none" or "mild," and there are no periods of decompensation, then the Commissioner will generally find the impairment not severe. 20 C.F.R. § 1520a(d)(1). If the ALJ's scoring of the claimant's limitations compels a finding that the claimant's mental impairment(s) is severe, the ALJ then proceeds to determine "if it meets or is equivalent in severity to a listed mental disorder." § 1520a(d)(2).

The Commissioner is required to document his application of the special review technique at all stages in the administrative adjudication of a disability claim. 20 C.F.R. § 1520a(e). During the initial stages of review, application of the "special technique" is facilitated by the completion of a Psychiatric Review Technique Form ("PRTF") by a qualified professional. During review by the ALJ, the ALJ is required "to complete a PRTF and append it to the decision, or incorporate its mode of analysis into [the ALJ's] findings and conclusions. Failure to do so requires remand." Moore v. Barnhart, 405 F.3d 1208, 1214 (11th Cir. 2005). Importantly, the ALJ is required to document his or her application of the technique as to each of the given functional areas, and failure to do so precludes judicial review of the ALJ's decision. Id. Failure to properly apply the special review technique requires remand even if the ALJ's ultimate finding that the claimant is not disabled is supported by substantial evidence. Id. See also Binion, 2008 WL 4493238 at *4.

Taylor, 2009 WL 5184402 at *3-4.  In other words, the mere existence of physical or

mental impairments, even if supported by sufficient medical evidence, does not reveal the

extent to which they limit claimant's ability to work or undermine an ALJ's

determination in that regard.  "[T]he 'severity' of a medically ascertained disability must

be measured in terms of its effect upon ability to work, and not simply in terms of

deviation from purely medical standards of bodily perfection or normality." Russell v.

Astrue, 331 Fed.Appx. 678, 681 (11th Cir. Jun. 15, 2009), quoting  McCruter v. Bowen,

791 F.2d 1544, 1547 (11th Cir. 1986).  Such is the purpose of the "special technique"

described above, which "requires separate evaluations on a four-point scale of how the

claimant's mental impairment impacts four functional areas: "activities of daily living;

social functioning; concentration, persistence, or pace; and episodes of decompensation"

and must be incorporated in the ALJ's findings and conclusions.  Moore, 405 F.3d at

1213-14, *citing* 20 C.F.R. §§ 404.1520a-(c)(3-4) and (e)(2).

IV.   Findings of Fact and Conclusions of Law.

A.  Statement of Facts.

1.     Vocational Background.

Bennett was born on November 26, 1969, and was 37 years old on her alleged

onset of disability date and 40 years old on the date of the ALJ's decision (Tr. 17, 101).

Bennett has a high school education (Tr. 156)[4], and has worked as a poultry hanger and

trimmer, and fish industry utility hand (Tr. 40, 131).

2.     Medical Evidence before the ALJ.

Bennett's medical records include records from the Tuscaloosa Ear, Nose and

Throat Center dating November 5, 2004, June 1, 2005, and February 3, 2006 (Tr. 164-

167, 169-170), which relate to the evaluation of her hearing.  A notation appears on the

---

[4] Bennett'a counsel makes a number of suppositions regarding his client's educational experience
(doc. 16 at 2) but the sparse evidence regarding Bennett's educational experiences is insufficient to justify
such suppositions, particularly in view of Bennett's testimony that she reads for approximately two hours
per day (Tr. 126), needs no help or reminders taking her numerous medications (Tr. 124), regularly
checks her own blood sugar levels (Tr. 27), and no treating physician has ever reported any doubt
regarding Bennett's  ability to understand and follow through with medical assessment and treatment.

February 3, 2006 record that indicates that Bennett had been treated for diabetes for four and a half years and that she had "good [blood sugar] control" (Tr. 169).

In February 2008, Bennett presented to Hale County Health Center with complaints of abnormal uterine bleeding, and an ultrasound of her pelvis revealed multiple uterine fibroids (Tr. 173, 190-91). At a follow-up one month later in March 2008, Bennett reported that her gynecological problems were not interfering with her activities of daily living (Tr. 188).

Bennett underwent a routine physical exam at Hale County Health Center on June 13, 2008 (Tr. 184). Her history of "irregular menses" was noted but she denied any heavy bleeding or pain with her periods (Tr. 184). She had full range of motion of the cervical spine and the extremities bilaterally with no peripheral edema (Tr. 184). She was intact neurologically (Tr. 184). Bennett's diabetes was reported to be controlled and she was advised to continue with her current treatment (Tr. 185).

At a follow-up two weeks later, on June 25, 2008, Bennett complained of pain and numbness in her left arm radiating to her left hand. (Tr. 181). She reported that she had been "diagnosed with arthritis in her hands in the past" for which she took Tylenol but it did not alleviate the pain (Tr. 181). She was noted to have full active range of motion of the extremities bilaterally, no edema of the left wrist or hand, and +5 motor strength of the extremities bilaterally (Tr. 181). Bennett was diagnosed with degenerative joint disease ("DJD") and prescribed Naproxen (Tr. 181).

On September 2, 2008, Bennett was evaluated by Stephen Favrot, M.D. for hearing loss (Tr. 212). She reported that she had been hard of hearing since at least age

14

ten, and benefitted from hearing aids (Tr. 212). Dr. Favrot assessed her with mid

frequency sensorineural hearing loss, which could be largely overcome with

amplification (Tr. 212).

On May 9, 2009, Bennett presented to Whatley Health Services with complaints of

pain and swelling in her right hand and both feet for two weeks and frequent urination

(Tr. 271).  Naproxin was prescribed and plans were made to check Bennett's Vitamin D

level (Tr. 271).  It was noted that her diabetes was controlled and she should continue

with her oral diabetes medicine and diabetic ("ADA") diet (Tr. 271).  Bennett was

subsequently prescribed Vitamin D and Iron supplements and notified by phone (Tr.

270).

On August 8, 2009, Bennett presented to Whatley Health Services for a follow up

and renewal of all her prescriptions, including the Vitamin D and Iron supplements, her

blood pressure medicine and the diabetes medicine (Tr. 269).  She was also encouraged

not only to continue the ADA diet, but to get regular exercise (Tr. 269).

Bennett's next visit to Whatley Health Services was on October 22, 2009, when

she complained of headaches for a week and numbness in both hands for four days and

numbness in the left side of her face "off & on" for four to six weeks (Tr. 267, 266).  It

was noted that Bennett had not been taking her medication because she ran out and

reported being unable to afford them (Tr. 266).  New prescriptions were provided as well

as samples (Tr. 266).  It was also noted that, with respect to her fibroids and heavy

menstrual cycles, Bennett was "doing okay with pain at this time" and would continue

with iron supplementation (Tr. 266).

15

On March 5, 2010, Bennett presented to Whatley Health Services, Inc. for maintenance of her diabetes, hypertension and "off and on" joint pain (Tr. 263). She reported that her blood sugar has been well controlled despite drinking "regular sodas" and eating "sweets on occasion" (Tr. 263).  Her blood pressure was recorded at 100/64 (Tr. 263, 265).  She was assessed with arthralgia[5] (Tr. 264). She requested a different medication for her joint pain, and was prescribed Mobic (Tr. 264).

On July 7, 2010, Psychologist Donald Blanton, Ph.D., reported his evaluation of Bennett at the request of her attorney (Tr. 273-76).  IQ testing revealed Bennett had a full scale IQ of 63 (Tr. 274). Dr. Blanton assessed her with dysthymic disorder, pain disorder with anxiety and depression, and mild mental retardation (Tr. 275). Dr. Blanton concluded that Bennett's limitations seriously interfered with her ability to understand, carry out, and remember detailed or complex instructions; use judgment in detailed or complex work-related decisions; and maintain attention, concentration, and pace for a period of at least two hours (Tr. 276).

3.   <u>Medical Evidence before the Appeals Council</u>.

Bennett was seen at Hale County Hospital Clinic for various complaints on six occasions from January 2010 to August 2011 (Tr. 280-85).   On September 14, 2011, Marquisha Jarmon, M.D., completed a "medical source statement" indicating that Bennett could occasionally lift 10 pounds and frequently lift 5 pounds and should avoid temperature extremes and work around hazardous machinery (Tr. 304). Dr. Jarmon also

---

[5] Arthralgia is a medical term that refers to the symptom of joint pain. http://arthralgia.net.

completed a "clinical assessment of pain," indicating that pain was present to such an

extent as to be distracting to adequate performance of daily activities; physical activity

greatly increased pain to such a degree as to cause distraction from task or total

abandonment of task; and significant side effects may be expected which may limit

effectiveness of work duties or performance of everyday tasks (Tr. 304).

### 4.    Plaintiff's Written Statements and Testimony.

On July 4, 2008, Bennett completed a "function report," and stated that she

cleaned her house every day, which took four hours; cooked daily, which took three

hours; and went outside four times a day (Tr. 122, 124). She also stated on the form that

she had no problems attending to all her personal care needs, including bathing, dressing,

and caring for her hair (Tr. 123). She further stated that she needed no special reminders

to take her various medications (Tr. 124).  She also said that she drove, and shopped

every week for two hours (Tr. 125). She stated that she could pay bills, count change,

handle a savings account, and use a checkbook/money orders[6] (Tr. 125).  She indicated

by checking a "yes" box that her "ability to handle money changed since the illness,

injuries, or conditions began" but failed to explain "how the ability to handle money

ha[d] changed."  (Tr. 126). She further stated that she read for two hours every day and

spent time with her children and her husband (Tr. 126).  In the report, she denied any

changes in her social activities due to illness, injury or any other condition (Tr. 127).  She

---

[6] Bennett testified during the hearing, however, that she paid her bills either in cash or by money order and never had a checking account (Tr. 38).

also stated that she got along well with others, including authority figures (Tr. 127-28). She further stated that she could follow instructions, and handled stress well, but handled changes in routine poorly (Tr. 127-28).

At the hearing before the ALJ on July 1, 2010, Bennett testified that she had numbness in her hands and feet, and that she could walk 5-10 minutes at a time and stand 10-20 minutes at a time (Tr. 28-29). She testified that "my knees get numb" when she is sitting (Tr. 29). She lays down during the day "maybe about three or four hours" and elevates her feet (Tr. 29). Her hand pain was a "9" out of "10" on a 10-point scale, and her fibroid tumors caused pain at level "10" out of "10" (Tr. 31-32). She uses epson salt and alcohol to soak her feet when they are numb, which helps (Tr. 32). She used hearing aids, which helped (Tr. 33-34).

### 5.    The Administrative Law Judge's Decision.

The ALJ found that Bennett met the insured status requirements of the Act through March 31, 2011 (Tr. 12). The ALJ found that she had not engaged in substantial gainful activity since March 15, 2007, the alleged onset date (Tr. 12). The ALJ found that she had the following "severe" impairments: sensorineural hearing loss, diabetes mellitus, neuropathy, degenerative joint disease, and a history of fibroid tumors (Tr. 12). The ALJ found that she did not have an impairment or combination of impairments that met or medically equaled the criteria of one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (Tr. 12). The ALJ specifically concluded that her impairments "have not been shown to impose limitations as mentioned in the listings" (Tr. 12).

The ALJ found that Bennett had the following residual functional capacity (RFC)

18

and capabilities: light work; precluded from climbing ladders, ropes, or scaffolds; from balancing on narrow, slippery, or erratically moving surfaces; from working at unprotected heights; and from operating hazardous machinery; moderate hearing loss; can only utilize the left upper extremity for gross and fine manipulation occasionally; and can occasionally utilize the lower extremities for pushing, pulling, or for operation of foot controls (Tr. 13). The ALJ, upon consideration of all the evidence, found that Bennett's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment" (Tr. 14). The ALJ acknowledged that Bennett has a "moderate mid-level hearing loss" but has accommodated this impairment in his RFC (Tr. 14).

The ALJ also noted that Bennett's hypertension and diabetes "have been repeatedly described as being controlled on prescribed medications, without reported side effects" (Tr. 14). The ALJ also found that, in addition to being often described as Healthy in appearance, Bennett's physical examinations have regularly "achieved normal or essentially normal results" and progress notes have described her as "being in no acute distress" and "alert and oriented in all spheres" (Tr. 14). The ALJ also noted that she was "observed with a full range of motion with no swelling in her extremities [and] demonstrate[ing] full motor strength and no neurological abnormalities" (Tr. 14). The ALJ also relied on Bennett's repeated denial of headaches, weakness, swelling or dizziness and any adverse side effects from her prescribed medications (Tr. 14-15, *citing* r. 143, 147-148, 181-210, 240-259, 261-272). The ALJ discounted any allegation that her left hand and degenerative joint disease of the hand were not accommodated in his

RFC assessment by discussing at length Bennett's description of her activities of daily living dated July 4, 2010 [Tr. 121-129].

The ALJ also discounted Bennett's contention that her fibroid tumors caused her pain at a level of 10 out of 10 as "unsupported by the record" because:

> [S]he was repeatedly told that she needed to be referred to gynecology for her tumors, yet she declined every time.  She was offered oral contraceptives, which she declined [Tr. 188, 196].  [Bennett] alleges that she declined a referral for financial reasons; however, this appears to be inconsistent with and uncorroborated by the record.  In May 2010, [Bennett] requested another ultrasound of her tumors; however, she was told that the results would likely be the same as in 2008.  She was told to use the money to see an OB/GYN for a consult rather than on another ultrasound [Tr. 264].  Further, [Bennett] reported to her nurse practitioner, Susan Roy, that her gynecological problems were not interfering with her activities of daily living [Tr. 188].

(Tr. 15).   The ALJ also discounted the opinion of Donald W. Blanton, Ph.D. [Tr. 273-276][7] on the grounds that, "in stark contrast to Dr. Blanton's post hearing, attorney-paid consultative examination findings of mental retardation and moderate depression, neither the claimant nor her attorney alleged any mental, cognitive, or emotional impairments

---

[7] The ALJ summarized Dr. Blanton's opinion as follows:

> In July 2010, Dr. Donald Blanton performed a consultative examination on the claimant at the claimant's attorney's request.  The claimant's chief complaint was having her period three times a month.  She reported pain in her arms and hands and numbness in her face.  She alleged that she began having nerve trouble and depression when she was 19 or 20 years old, which she traces back to working with chemicals.  Dr. Blanton reported that the claimant's mental retardation was "obvious."  He performed an IQ test on the claimant, which purportedly resulted in a full scale IQ score of 63.  Her academic achievement testing allegedly revealed that the claimant is functionally illiterate.  He opined that the claimant would be seriously limited in her ability to understand, to carry out, or to remember detailed or complex instructions.  He opined that the claimant would have difficulty using judgment in detailed or complex work-related decisions and that she would have difficulty maintaining attention, concentration, and pace for a period of at least two hours.

(Tr. 14, *citing* Tr. 273-276).

20

[and] [n]o such impairments are in the claimant's treating source records" (Tr. 15).  The

ALJ further reasoned:

> [Bennett] completed all high school graduation requirements, achieved
> good high school grades, was not in special education, and testified that she
> received a high school diploma [Tr.144, 156].  [Bennett] has not received
> mental health treatment, has not been diagnosed with a mental impairment
> by her treating sources, and has not been prescribed medications for any
> psychological conditions.  [She] reported that she can follow instructions
> well, gets along with others, can handle monetary task, and can pay
> attention for sustained periods [Tr. 124-128].
>
> As for the opinion evidence, little weight is given to the opinions within Dr.
> Blanton's consultative examination.  His opinion is wholly unsupported by
> the record taken as a whole and is uncorroborated by [Bennett's] own
> allegations.  Further, he is a one-time examiner, not a treating source,
> whose opinion might be entitled to enhanced weight.  The undersigned
> notes that, regardless of the limitations set forth in the report, Dr. Blanton
> never opined that [Bennett] was incapable of performing the unskilled work
> cited by the vocational expert, but instead suggested that [Bennett] was
> precluded from performing only complex or detailed tasks [Tr. 276].

(Tr. 15).  The ALJ found that, "[i]n sum, the claimant simply alleges a greater degree of

disability than is warranted by the objective medical evidence and the record as a whole,

including her own submissions [inasmuch as she] reported few, if any, limitations within

her activities of daily living questionnaire."  (Tr. 16, *citing* Tr. 121-129).

The ALJ found that Bennett was unable to perform any past relevant work (Tr.

16). However, the ALJ found that there were jobs existing in significant numbers in the

national economy that Bennett could perform (Tr. 16). Thus, the ALJ found that Bennett

was not disabled within the meaning of the Act, from March 15, 2007, through the date

of the decision (Tr. 17).

> 6.    <u>Vocational Expert Testimony</u>.

21

Claude Peacock, the Vocational Expert ("VE"), described Bennett's past work in two jobs in the poultry industry as including work as a poultry hanger, which is consistent with DOT # 525.687-082 and "classified as medium, unskilled with an SVP of 1" (Tr. 40). She also worked as a trimmer and dresser, which is consistent with DOT # 525.687-070, and classified as "light, unskilled, with an SVP of 2" (Tr. 40). In the fishing industry, Bennett worked as a fish filleter and utility hand, which is consistent with DOT # 521.686-086 and classified as "light, unskilled, with an SVP of 2" (Tr. 40).

The ALJ asked Mr. Peacock to consider a hypothetical individual who was Bennett's age, with the same education, and work experience. The hypothetical individual also was assigned the following limitations: precluded from climbing ladders, ropes, or scaffolds, from balancing on narrow, slippery, or erratically moving surfaces, from working at unprotected heights, and from operating hazardous machinery; moderate hearing loss; can only utilize the left upper extremity for gross and fine manipulation occasionally; and can occasionally utilize the lower extremities for pushing, pulling, or for operation of foot controls (Tr. 41). The ALJ asked whether there were occupations that the hypothetical person could do (Tr. 42).

Mr. Peacock testified that there were three light[8], unskilled[9] jobs that such an individual could perform unskilled, which he set forth as:  vacuum former, which is

---

[8] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." Id. § 404.1567(b).

[9] Unskilled work is defined as "work which needs little or no judgment to do simple
(Continued)

designated as DOT # 556.685-082[10], with 310 jobs available in North Central Alabama and 28,000 jobs available nationally; molding machine tender, designated as DOT # 556.685-062, with 340 jobs available in North Central Alabama and 28,000 jobs available nationally; and conveyer tender, designated as DOT # 529.685-046, with 280 jobs available in North Central Alabama and 14,000 jobs available nationally (Tr. 42-43).

B.      Analysis.

1.      **The ALJ did not err in rejecting the opinion of Bennett's retained examining consultant, Donald W. Blanton, Ph.D.**

Bennett argues, in sum, that the ALJ erred in rejecting Dr. Blanton's opinion because it was supported by her school records and constitutes "uncontroverted medical testimony." (Doc. 16 at 2-3, 4).   Bennett also contends that the ALJ's decision "is not supported by substantial evidence" because "[t]here was no other mental health evaluation . . . to confirm or contradict Dr. Blanton's opinion." (*Id*. at 4).  Bennett's contentions are without merit.

The ALJ rejected the opinion of Dr. Blanton, a one-time examining medical source[11], because it was not consistent with the record as a whole.  *See* 20 C.F.R. §§

---

duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a).

[10] These designations are derived from U.S. Dep't of Labor, Employment & Training Admin., Dictionary of Occupational Titles (4th ed. 1991).

[11] The ALJ essentially recognized that Dr. Blanton was not a treating source whose opinion might be entitled to enhanced weight (Tr. 15). *See* McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987) (opinions of one-time examiners are not entitled to deference because they are not treating physicians).

404.1527(c)(4) (An ALJ must consider whether an opinion is consistent with the record as a whole). Here, the ALJ found that Dr. Blanton's finding of mental retardation and moderate depression was "wholly unsupported by the record taken as a whole and [was] uncorroborated by Bennett's own allegations" (Tr. 15). As the ALJ noted, "[n]o such impairments [were] in [Bennett's] treating source records" (Tr. 15). No treating physician ever noted a difficulty on Bennett's part understanding any instruction or explanation given regarding her medical condition or treatment. Instead, her medical records reflect a capacity to follow instructions regarding medications as well as diet, as illustrated, for example, by her well controlled diabetes on pills and diet (*see e.g.*, Tr. 27).

Further, Dr. Blanton's opinion was inconsistent with the activities and aptitudes described by Bennett in the Function Report she completed on July 4, 2008. Therein she stated that she cleaned her house, cooked, went shopping, read for two hours every day, watched television, and spent time with her children and her husband (Tr. 122-26). Although she testified at the hearing on July 1, 2010, that she can walk about 10 minutes and stand about 10-20 minutes at a time, that her knees get numb when sitting, and she lays down during the daytime "maybe three or four hours" and elevates her feet (Tr. 28-29), she did not testify that she no longer cleaned her house, cooked, went shopping, read for two hours a day, watched television, or spent time with her children and her husband (Tr. 27-34). Bennett testified that her thirteen year old daughter helps her with the housework, including the mopping, but she tries to do the sweeping and does the cooking (Tr. 29-30). She further testified that she soaked her feet in epson salt and alcohol for the numbness and "it helps out" (Tr. 32). She also testified that her hearing aids "help a little

24

[but] they still have to tell me twice" (Tr. 33).  Bennett was not wearing her hearing aids

at the hearing on July 1, 2010, because "they wouldn't work" (Tr. 33) but never

requested, according to the transcript, that her counsel or the ALJ repeat any question to

her (Tr. 21-47).

Bennett further stated in the Function Report dated July 4, 2008, that she got along

well with others, including authority figures, and could follow instructions (Tr. 127-28).

She did not claim otherwise during her testimony at the hearing on July 1, 2010 (Tr. 21-

47).  Bennett's employment history, including her relatively long term regular

employment from 1995 to 2001 with "Golden Rod" doing work classified as SVP 1 and

2[12] is also inconsistent with Dr. Blanton's contention that Bennett has "marked

limitations in understanding, carrying out and remembering detailed or complex

instructions; using judgment in detailed or complex work related decisions; and

maintaining attention, concentration and pace for a period of at least two hours." (Doc. 16

at 3, *citing* Tr. 276).  Although Bennett contends that she was not required "to list each

and every impairment at the time of the application" (doc. 16, at 3), she nonetheless bore

the burden to establish her impairments and this she has failed to do.  *See* Phillips, *supra*,

---

[12] The DOT, in classifying each occupation, has a category captioned Specific Vocational
Preparation (SVP) which "is defined as the amount of lapsed time required by a typical worker to learn
the techniques, acquire the information, and develop the facility needed for average performance in a
specific job-worker situation." Dictionary of Occupational Titles 1009 (4th ed. 1991). The scale ranges
from one to nine with level one requiring only a short demonstration and level two requiring up to and
including one month while a level nine occupation requires over ten years of preparation. *Id.*  A surgeon
has an SVP of 9 while a thread-pulling-machine attendant has an SVP of 1. *Id.* at 070.101-094, 689.686-
046.

357 F.3d at 1237-39; *see also* <u>Sellers v. Barnhart</u>, 246 F.supp.2d 1201, 1210 (M.D. Ala.

2002).  The Social Security Regulations provide, in pertinent part:

> In general, you have to prove to us that you are blind or disabled. Therefore, you must bring to our attention everything that shows that you are blind or disabled. This means you must furnish medical ***and other evidence*** that we can use to reach conclusions about your impairment(s) and, if material to the determination of whether you are blind or disabled, its effect on your ability to work on a sustained basis.

20 C.F.R. § 404.1512(a) (emphasis added).  Bennett has not even alleged, prior to her

assessment by Dr. Blanton, any impairment in her capacity to remember or understand

instructions or in her ability to concentrate, and has not presented any evidence to support

the existence of any such limitation, let alone a limitation which could be characterized as

"marked."   Bennett's reference to the interviewer's comment on the "teleclaim" report

that Bennett was "unorganized and scattered" is unavailing. (Doc. 16 at 3, *citing* Tr. 119).

The interviewer not only failed to explain what was meant by the notation, but also

indicated that Bennett had "**NO**" difficulties with "Understanding"; "Coherency";

"Concentrating"; "Talking"; or "Answering" (Tr. 119, emphasis added).

The ALJ also noted that Dr. Blanton did not conclude that Bennett was incapable

of performing unskilled work; rather, he suggested that she was precluded from

performing only complex or detailed tasks (Tr. 15, 276). Bennett actually agreed in her

brief to this Court, as follows:

> According to the <u>Diagnostic and Statistical Manual of Mental Disorders</u> (DSM), an individual with mild mental retardation can be expected to acquire sufficient vocational skills for minimal self-support. (DSM at 41, attached.) Mild mental retardation in and of itself does not render an individual disabled.

(Doc. 16 at 4).

Bennett's reliance on <u>Carril v. Barnhart</u>, 201 F.Supp.2d 1190 (N.D. Ala. 2002), is unavailing.  There is no indication in <u>Carril</u> that the mental health consultative evaluation report erroneously rejected by the ALJ was proposed by a psychologist retained by the claimant in the absence of any evidence in the record that the claimant suffered from any mental impairment.  Instead, Court in <u>Carril</u> refers to <u>Wilder v. Chater</u>, 64 F.3d 335, 337 (7th Cir. 1995), as a "similar" case and quotes from it:

> We are led to consider with a degree of suspicion the administrative law judge's decision to go against the only medical evidence in the case, that of a psychiatrist ***not retained by the applicant but appointed by the administrative law judge himself*** to advise on Wilder's condition. Of course the administrative law judge is ***not required or indeed permitted to accept medical evidence if it is refuted by other evidence—which need not itself be medical in nature***—and of course our review is deferential, and of course it is far from certain that Wilder was disabled in 1986. But the administrative law judge's analysis is so deficient that we must remand the case.

201 F.Supp.2d at 1191, n.1 (emphasis added).  This would seem to indicate that the ALJ in <u>Carril</u> actually requested the mental health consultative evaluation but then rejected that opinion despite the absence of refuting evidence in the record.  As shown above, Dr. Blanton's opinion is refuted by other evidence in this record. The ALJ specifically found, in pertinent part:

> On the mental side of the ledger, and in stark contrast to Dr. Blanton's post hearing, attorney-paid consultative examination findings of mental retardation and moderate depression, neither the claimant not her attorney alleged any mental, cognitive, or emotional impairments [Tr. 273-276].  No such impairments are in the claimant's treating source records... The claimant has not received mental health treatment, has npt been diagnosed with a mental impairment by her treating sources, and has not been prescribed medications for any psychological condition.  The claimant

> reported that she can follow instructions well, gets along well with others, can handle monetary tasks, and can pa attention for sustained periods. [Tr. 121-129].
>
> As for the opinion evidence, little weight is given to the opinions of Dr. Blanton's consultative examination.  His opinion is wholly unsupported by the record taken as a whole and is uncorroborated by the claimant's own allegations.  Further, he is a one-time examiner, not a treating source, whose opinion might be entitled to enhanced weight.

(Tr. 15).

Because the ALJ has articulated specific reasons, supported by the record, for rejecting Dr. Blanton's opinion regarding the existence of any "marked limitations" in such abilities as "maintaining attention, concentration and pace for a period of at least two hours," his decision that Bennett did not have a severe mental health impairment is supported by substantial evidence in this case. *See* Ogranaja v. Comm'r of Soc. Sec., 186 F. App'x 848, 850 (11th Cir. 2006) (substantial evidence supported decision that claimant did not have a severe mental health impairment because one sole mental evaluation, based on subjective complaints and not on significant clinical findings, was not sufficient to establish that claimant had a mental problem that resulted in significant limitations; neither the claimant's allegations nor unsupported diagnoses were sufficient, in and of themselves, to establish the existence or degree of an impairment).  Consequently, the ALJ did not err in rejected Dr. Blanton's opinion and was not required to obtain another consultative mental health evaluation.

2.   **The ALJ did not err in failing to find that Bennett meets Listing 12.05C.**

In this Circuit, "a claimant meets the criteria for presumptive disability under Listing 12.05(C) when the claimant presents a valid I.Q. score of 60 to 70 ***and evidence of additional mental or physical impairment***." Hodges v. Barnhart, 276 F.3d 1265, 1269 (11th Cir. 2001), *citing* Lowery v. Sullivan, 979 F.2d 835, 838 (11th Cir.1992).  The Eleventh Circuit has further clarified that:

> The mental retardation Impairment Listing in § 12.05C requires the claimant to demonstrate a "significant subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the development period; i.e., the evidence demonstrates or supports onset of the impairment before age 22," as well as a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."

Grant v. Astrue, 255 Fed.Appx. 374, 375 (11th Cir. Nov. 13. 2007), *quoting* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00A, 12.05, 12.05C.

In this case, Dr. Blanton reported Bennett's IQ test score to be 63.  Bennett then relies on the ALJ's finding that she had severe impairments of sensorineural hearing loss, diabetes mellitus, neuropathy, degenerative joint disease and a history of fibroid tumors (Tr. 12).  Bennett contends that "[a] claimant satisfies the second half of listing 12.05C when the additional impairment's effect on "a claimant's ability to perform 'basic work activities' is more than slight or minimal … but less than 'severe.'" (Doc. 16 at 5, *quoting* Edwards by Edwards v. Heckler, 755 F.2d 1513, 1515 (11th Cir. 1985).   However, as explained in Black v. Astrue, 678 F.Supp.2d 1250, 1262 (N.D. Ala. 2010):

> Under an earlier version of this Listing, our circuit interpreted this as
> something that is "significant" but less than a "severe impairment" as
> defined at Step 2. <u>Edwards by Edwards v. Heckler</u>, 755 F.2d 1513, 1515
> (11th Cir.1985) (emphasis added). But (citation omitted), this was modified
> in 2000 and the introductory paragraph of Listing 12.00 now equates this
> criterion with a "severe" impairment as intended at step 2 and governed by
> 20 C.F.R. §§ 404.1520(c) and 416.920(c).

678 F.Supp.2d at 1262.  Consequently,  Bennett's IQ score of 63, even when taken with

the existence of these "severe" impairments, merely established a "rebuttable

presumption" of disability under Listing 12.05C if she satisfies all the Listing's

requirements.  *See* <u>Williams v. Astrue</u>, 2011 WL 3241823, *1 (S.D. Ala. July 28, 2011)

(A claimant must satisfy all the Listing requirements and "Defendant still had the

opportunity to rebut the presumption by showing that he does not suffer from deficits in

adaptive functioning.").

To show that an impairment matches a listed impairment, a claimant must "meet

***all*** the specified medical criteria," as an "impairment that manifests only some of those

criteria, no matter how severe, does not qualify." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530

(1990) (emphasis in original). In this case, to show that an impairment is "equivalent to a

listed impairment, [Bennett] must present medical findings equal in severity to all the

criteria for the one most similar impairment." *Id*. at 531.   Bennett has not, however,

satisfied the listing's diagnostic description of mental retardation.

"Intelligence tests are only part of the overall assessment" to determine whether

mental retardation is present. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(6)(a). A low

IQ score, standing alone, is insufficient to satisfy Listing 12.05's introductory paragraph;

evidence must also demonstrate deficits in adaptive functioning, with an onset prior to

age 22. Foster v. Halter, 279 F.3d 348, 355-56 (6th Cir. 2002); *see also* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992). Listing 12.05 does not require the ALJ to make a finding that the Listing is met based solely on the results of I.Q. tests. *See* Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir.1986).  Rather, I.Q. test results must be consistent with a plaintiff's daily activities and behavior. *Id*. Additionally, the Eleventh Circuit has held that when a plaintiff presents a valid I.Q. score in the range prescribed by Listing 12.05, then that plaintiff creates a rebuttable presumption that the impairment is lifelong and existed during the developmental period. Hodges v. Barnhart, 276 F.3d 1265, 1269 (11th Cir.2001). Under Hodges, however, the ALJ can present activities in the daily life of a plaintiff to rebut the presumption of a lifelong impairment. *Id*.

> Impairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with Mental Retardation. Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.

American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders (4th ed. Text Revision 2000) (DSM-IV-TR) (emphasis in original).

Although Bennett obtained a full scale IQ score of 63 in testing with Dr. Blanton in July 2010, she did not demonstrate deficits in adaptive functioning, with an onset prior to age 22, as required by the mental retardation listing's introductory paragraph. As the ALJ noted, neither Bennett nor her attorney claimed any mental, cognitive, or emotional

impairments (Tr. 15)[13].  Despite Bennett's suppositions regarding the on-line courses

taken and the diploma received from Nationwide Academy High School, Bennett has

presented no evidence that she was in special education or did not legitimately earn her

diploma.  She completed all high school graduation requirements at Nationwide

Academy High School, and testified that she received a high school diploma (Tr. 35,

156).  Although Bennett complains that the ALJ did not consider school records from

Greensboro Public Schools (Tr. 158-59), the failure to discuss specific evidence does not

mean that it was not considered. *See* McCray v. Massanari, 175 F.Supp.2d 1329, 1336

(M.D. Ala. 2001)(*citing* Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)). The ALJ also

noted that Bennett admitted that she could perform everyday monetary tasks (Tr. 15).

Additionally, the record reflects that Bennett was engaged in substantial gainful

activity for several years, and there is no allegation that she ever quit working due to any

mental or cognitive impairment (Tr. 116-17, 131-36). *Cf.* Caldwell v. Astrue, 2011 WL

4945959, at *4 (W.D. N.C. Oct. 18, 2011) ("The DSM explicitly enumerates 'work' as a

component of adaptive functioning. Therefore, the ALJ properly considered Bennett's

prior work experience in the context of considering whether [] Plaintiff met the

[diagnostic description] of [Listing 12.05].").

Consequently, because the record established that Bennett did not have deficits in

adaptive functioning prior to age 22, she did not meet the requirements of Listing 12.05C,

---

[13] At the July 2010 hearing, Plaintiff's attorney denied any contention that Plaintiff's impairments met or equaled a listed impairment (Tr. 26). Plaintiff (through her attorney) first contended that she met the requirements of Listing 12.05C when she requested the Appeals Council's review of the ALJ's decision (Tr. 95-97).

notwithstanding her IQ score.

> 3. **The Appeals Council did not err in failing to remand for consideration of the September 14, 2011 opinion of Bennett's treating physician regarding her pain.**

At the hearing conducted by the ALJ on July 1, 2010, the ALJ stated that he would "hold the record open for two weeks" to permit Bennett to obtain the remaining pertinent medical records (Tr. 26). The ALJ's decision was entered on September 15, 2010 (Tr. 10-17). As part of her request for review of the ALJ's decision, Bennett submitted additional evidence to the Appeals Council, namely medical records dating from January 20, 2010 to August 16, 2011, reflecting evaluation treatment provided to Bennett by Marquisha Jarmon, M.D. at the Hale County Hospital Clinic, as well as a Medical Source Statement (Physical) form[14] and Clinical Assessment of Pain form[15] completed by Dr. Jarmon on September 14, 2011 (Tr. 279-305). The Appeals Council considered the additional evidence submitted by Bennett but denied review of the ALJ's decision because that evidence did not provide a basis for changing the ALJ's decision (Tr. 1-2).

---

[14] Dr. Jarmon indicated Bennett could occasionally lift and/or carry up to ten pounds but never more. She should avid extremes of temperature. She could occasionally climb stairs, perform fine manipulation, bend, stoop, and reach. She could rarely perform pushing and pulling movements. She could never work with or around hazardous machinery. She indicated the symptoms seemed to be worsening. (Tr. 304).

[15] Dr. Jarmon indicated pain was present to such an extent as to be distracting to adequate performance of daily activities by Bennett. Dr. Jarmon further opined that physical activity would result in greatly increased pain and to such a degree as to cause distraction from task or total abandonment of task and that significant side effects may be expected from her medications which may limit effectiveness of work duties or performance of everyday tasks. (Tr. 305). In contrast, however, Dr. Jarmon states that Bennett's pain does *not* "prevent her from maintaining attention, concentration or pace for periods of at least two hours" (Tr. 305, emphasis added).

Bennett argues, in sum, that the Appeals Council did not properly evaluate the opinion of Dr. Jarmon, claimant's treating physician, even though it was dated September 14, 2010, one year following the ALJ's decision, and the case must therefore be remanded.  (Doc. 16 at 6-7, *citing* Ingram v. Commissioner, 496 F.3d 1253, 1262 (11th Cir. 2007)("[W]hen a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous."); Perkins v. Astrue, 2012 WL 2508025, *4 (S.D. Ala. June 29, 2012)("[T]he Appeals Council here did not demonstrate that it adequately evaluated the new evidence or did anything more than perfunctorily adhere to the ALJ's decision.").

The Commissioner argues, in sum, that the additional evidence submitted to the Appeals Council by Bennett would not have changed the outcome of the ALJ's decision because "Dr. Jarmon's assessment was completed one year after the ALJ's decision; therefore, her opinion as to Plaintiff's work capacity was not relevant to the period considered by the ALJ."  (Doc. 19 at 13-14).  Consequently, "the Appeals Council was not required to provide a more thorough explanation than it did." Mansfield v. Astrue, 395 F. App'x 528, 530 (11th Cir. 2010).

A review of the records at issue supports the Commissioner's position.  Although these records begin with a clinic visit on January 20, 2010, the next visit does not occur until August 16, 2010 (Tr. 284-285).  On September 15, 2010, Bennett returned for a follow up and discussion of the tests performed pursuant to orders entered on August 16, 2010 (Tr. 283).  Nothing in the notes regarding these three clinic visits supports a contention that the ALJ's decision on September 15, 2010 to deny disability benefits was

erroneous.  Bennett's next visit was not until February 24, 2011, five months following the ALJ's decision, and the records fail to support Bennett's disability claims (Tr. 282). In fact, Dr. Jarmon does not render any opinion related to Bennett's work capacity until September 14, 2011, essentially one year following the ALJ's decision (Tr. 304-305). Consequently, Dr. Jarmon's opinion was clearly not relevant to the period considered by the ALJ.  The Appeals Council's denial of review was, therefore, proper because, at that time, the ALJ's decision was supported by substantial evidence on the record as a whole. Bennett's contention that her case should be remanded for the payment of benefits (doc. 16 at 7) is without merit.

CONCLUSION.

For the reasons stated above, the Court concludes and it is therefore **ORDERED** that the decision of the Commissioner denying plaintiff's application for disability benefits is supported by substantial evidence and is due to be and is hereby **AFFIRMED**.

**DONE** this __20th__ day of August, 2013.

/s/ Katherine P. Nelson
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**